FILED

04 OCT 19 PM 3:15

U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

**MICHAEL RANDMAN, AMY METHVIN, individually and for the METHVIN FAMILY LIMITED PARTNERSHIP, HAROLD C. BOZEMAN, CLARENCE H. BRANNON, JR., SUSAN B. DISMUKES, MICHAEL D. GOODSON, GIRISH MODI, FRANK WILLIS, DALE A. MARTIN, CECIL PARRISH, J. RICHARD THOMPSON, GERALD URITSKY, HERNDON INGE, III, GEORGE HEBLING, III, RICHARD P. and RITA C. BROWN, ROBERT A. BECKERLE, CHARLES H. HAMILTON, DWAYNE STRENGTH, JAMES and ERNESTA HODNETT, BRIAN MCDANIEL, HUBERT RATLIFF, ORVIS I. And CLARA J. HICKS, ALAVA SKIPWITH, HELEN PEPPER, THOMAS W. JORDAN, EARL B. MITCHELL, WILLIAM CHARLES ARTMANN, HENRY ALBERT WOOD, JR., WALLACE B. SWANSON, ALLIE S. POVALL, CHARLES E.  PETERS, EUGENIE BARROW, HAROLD D. SMITH, ALAN N. BAROODY, SAMMY PILCHER,  NANCY CALLAWAY, FRANK P. MISIAK, ROBERT C. KELLY, CLIFFORD E. And LORETTA R. JOHNSON, and JERE M. POUND,**

       **Plaintiffs,**

**vs.**

       **CIVIL ACTION NO. _____**

**LUCENT TECHNOLOGIES, INC.,**

       CV-04-C-3042-S

       **Defendant.**

---

## COMPLAINT

---

COME NOW The Plaintiffs and state the following causes of action against Defendant Lucent Technologies, Inc. ("Lucent"):

### Parties

1.      Michael Randman is an  individual more than nineteen (19) years of age and a resident citizen of Jefferson County, Alabama, which lies in the Southern Division of the Northern District of Alabama.  Mr. Randman timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court,

District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

2.    Amy Methvin, individually and for the Methvin Family Limited Partnership (hereafter the MFLP), is an individual more than nineteen (19) years of age and a resident citizen of Montgomery County, Alabama. Ms. Methvin, on behalf of the MFLP and herself, timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

3.    Harold C. Bozeman, Clarence H. Brannon, Jr., Susan B. Dismukes, Michael D. Goodson, Girish Modi, and Frank Willis are individuals more than nineteen (19) years of age and resident citizens of Montgomery County, Alabama. These plaintiffs timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

4.    Dale A. Martin, Cecil Parrish, J. Richard Thompson, Gerald Uritsky, Herndon Inge, III, George Hebling, III, Richard P. and Rita C. Brown, and Robert A. Beckerle are individuals more than nineteen (19) years of age and resident citizens of Baldwin County, Alabama. These plaintiffs timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

5.    John A. Bunch, Scott and Judy Jordan, Jene W. Owens, Jr., Mary A. Skelton, Douglas D. Kirkwood, Jr. and Grady Edmondson are  individuals more than

nineteen (19) years of age and resident citizens of Mobile County, Alabama. These plaintiffs timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

6.     Charles H. Hamilton is an individual more than nineteen (19) years of age and a resident citizen of Clarke County, Alabama. Mr. Hamilton timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

7.     Dwayne Strength is an individual more than nineteen (19) years of age and a resident citizen of Coosa County, Alabama. Mr. Strength timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

8.     James and Ernesta Hodnett and Brian McDaniel are individuals more than nineteen (19) years of age and resident citizens of Madison County, Alabama. These plaintiffs timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

9.     Hubert Ratliff is an individual more than nineteen (19) years of age and a resident citizen of Copiah County, Mississippi. Mr. Ratliff timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court,

District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

10.     Orvis I. and Clara J. Hicks, Alava Skipwith, and Helen Pepper are individuals more than nineteen (19) years of age and resident citizens of Hinds County, Mississippi. These plaintiffs   timely opted-out of the class settlement,   *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

11.     Thomas W. Jordan and Earl B. Mitchell are individuals more than nineteen (19) years of age and resident citizens of Rankin County, Mississippi.  These plaintiffs timely opted-out of the class settlement,  *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

12.     William Charles Artmann is an individual more than nineteen (19) years of age and resident citizens of Madison County, Mississippi. Mr. Artmann  timely opted-out of the class settlement,   *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

13.     Henry Albert Wood, Jr. is an individual more than nineteen (19) years of age and a resident citizen of Walthall County, Mississippi. Mr. Wood timely opted-out of the class settlement,  *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

4

14.     Wallace B. Swanson is an individual more than nineteen (19) years of age and a resident citizen of Lincoln County, Mississippi. Mr. Swanson timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

15.     Allie S. Povall is an individual more than nineteen (19) years of age and a resident citizen of Lafayette County, Mississippi. Ms. Povall timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

16.     Charles E. Peters is an individual more than nineteen (19) years of age and a resident citizen of Winston County, Mississippi. Mr. Peters timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

17.     Eugenie Barrow is an individual more than nineteen (19) years of age and a resident citizen of Chatham County, Georgia. Ms. Barrow timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

18.     Harold D. Smith is an individual more than nineteen (19) years of age and a resident citizen of Bryan County, Georgia. Mr. Smith timely opted-out of the class

settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

19.	Alan N. Baroody is an individual more than nineteen (19) years of age and a resident citizen of Baldwin County, Georgia.  Mr. Baroody timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

20.	Sammy Pilcher  is an individual more than nineteen (19) years of age and a resident citizen of Schley County, Georgia. Mr. Pilcher timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

21.	Nancy Callaway is an individual more than nineteen (19) years of age and a resident citizen of Houston County, Georgia.  Ms. Callaway timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court, District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

22.	Frank P. Misiak, Robert C. Kelly, Clifford E. and Loretta R. Johnson, and Jere M. Pound are individuals more than nineteen (19) years of age and resident citizens of Muscogee County, Georgia.  These plaintiffs timely opted-out of the class settlement, *In re Lucent Technologies, Inc. Securities Litigation*, U.S. District Court,

District of New Jersey Civil Action No. 00-621 (AJL), involving the claims pleaded herein.

23.   Defendant Lucent is a Delaware corporation with its principal place of business and chief executive offices located at 600 Mountain Avenue, Murray Hill, New Jersey. Lucent designs, builds and installs a wide range of public and private networks, communications systems, data networking systems, business telephone systems and microelectronics components, and manufactures integrated circuits and optoelectronics components for the computer and telecommunications industries.

## Jurisdiction and Venue

24.   Claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

25.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

26.   Venue is also proper in this district as a Plaintiff resided within this district at all times pertinent to this action and purchased and/or authorized the purchases of securities subject of this action within this district.

27.   In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications and the facilities of the national securities markets.

## Background and Facts

28.  Lucent was spun off from AT&T in 1996 and endowed at its inception with a dominant position in the market for telecommunications equipment. However, by mid-1999, Lucent had squandered that advantage. As the telecommunications industry shifted from transmission of voice to data, new technologies and products developed and new entrants into the marketplace began to compete with Lucent. Lucent represented that it was at the forefront of competition in these new arenas and publicly projected continuing dramatic growth, but the true circumstances at Lucent belied Defendant's representations.

29.  By the fall of 1999, the Company was confronting severe problems. First, Lucent had fallen seriously behind in developing optical networking products capable of running at "OC-192" speed, which had become the product of choice for Lucent's potential customers. Lucent also was experiencing widespread problems with a broad range of its other optical networking products. The difficulties with optical networking negatively impacted Lucent's sales and revenues. Second, problems of product design, reliability and timeliness of deliveries were widespread throughout Lucent's product lines including among others, optical networking, wireless, switching and software, causing customer dissatisfaction and withdrawal of orders, especially for Lucent's WaveStar and wireless products. Third, problems had developed with AT&T, Lucent's largest and most important customer, stemming from Lucent's unwillingness to manufacture to AT&T's specifications, AT&T's desire to diversify its sources of supply, and Lucent's inability to adequately develop products which met AT&T's requirements.

30.    By the fall of 1999, Lucent had met or exceeded analysts' published expectations
       for Lucent's revenue and earnings (which were premised on the "guidance"
       Lucent's management regularly provided to analysts) for fourteen straight quarters.
       However, Lucent's management acknowledged in internal e-mails discussing the
       problems that the Company's optical networking group was in "serious disrepair"
       and, as a result, Lucent was "up against a revenue wall."

31.    Indeed, by October 1999, as reported by The Wall Street Journal in an October 24,
       2000-article entitled "Lucent Ousts McGinn as CEO and Chairman," Lucent senior
       executives had informed defendant McGinn, Lucent's President, Chief Executive
       Officer and Chairman, that Lucent needed to drastically reduce its public projections
       of revenue and earnings because necessary new products were not ready for sale
       and sales of older products were in decline. McGinn refused to heed this
       instruction, and Lucent failed to cut back its aggressive public guidance to reflect
       the reality of its declining business.

32.    Instead, Defendant took various steps to conceal its true financial situation from the
       investing public. Among other things, Lucent misrepresented the demand for the
       Company's optical networking products without disclosing that demand had shifted
       dramatically away from the optical networking products Lucent was then able to
       deploy because the Company's products were slower than their rivals and beset by
       persistent technological problems. Lucent knew that, as a result, potential
       customers were deserting Lucent and buying from companies  that were already
       successfully deploying newer OC-192 capable products.

9

33.     Faced with declining demand for the only optical networking products it could
        reliably deliver and for its other products, Defendant decided to artificially inflate
        reported sales by shipping products that were not yet ready. Specifically, in
        September 1999, Lucent's optical networking head Harry Bosco told the Company's
        directors at a meeting in Nuremberg, Germany that Lucent's strategy was to ship
        optical networking products notwithstanding design and technical problems, and to
        solve those problems later. Although that decision was designed to increase
        reported sales, it exacerbated the existing problem of poor product quality, which
        had a further adverse impact on customer acceptance and sales.

34.     Upon information and belief, internal documents establish that Lucent's most senior
        officers knew throughout the period of October 26, 1999, and December 21, 2000
        that: (1) Lucent's accounting practices violated generally accepted accounting
        principles ("GAAP"); (2) Lucent had improperly booked hundreds of millions of
        dollars of revenue on sales to customers in situations where the customers had not
        ordered the product; (3) Lucent had improperly booked hundreds of millions of
        dollars of revenue on shipments to distributors even though Lucent's senior officers
        had specifically granted those distributors the right to return the products if they
        were ultimately not sold; (4) Lucent sales people were routinely entering into "side
        deals" with distributors to allow them to return the product while improperly
        reporting these deals as current sales; and (5) Lucent was "stuffing" its distributors
        with products they did not want or need (and in many instances had not even
        ordered). These documents establish that Lucent's accounting improprieties began

                                           10

during the first quarter of fiscal 2000 (ended December 31, 1999) and continued through, at least, December 21, 2000.

35.     Despite defendant's accounting machinations, on January 6, 2000 Lucent was forced to announce that the Company would miss analysts' earnings estimates for the first quarter of fiscal 2000. Rather than disclose the true reasons for the disappointing results, McGinn assured the market that demand for the Company's optical networking products was strong and that the principal causes of the shortfall were manufacturing constraints that limited the Company's ability to meet that demand and changes in timing (rather than cancellation) of customer orders. These statements were false.

36.     Thereafter, throughout the spring and summer of 2000, McGinn and Lucent reassured the investing public that the demand for the Company's products was very strong and that the Company was still a leader in all areas. In truth, however, during this time Lucent lost all of the business for its newest optical networking products with its largest customer, AT&T, and had internally declared a "sales crisis." By no later than the end of Lucent's fiscal 2000 second quarter (ended March 31, 1999), Lucent's most senior officers had explicitly recognized that "[a]s the first half of 2000 comes to a close, it is clear that we cannot continue with the current operational model -- it just doesn't work." Nevertheless, by engaging in a variety of improper accounting practices and fraudulent revenue recognition, Lucent was able to report results for the March quarter which met expectations. On the

11

strength of Lucent's false assurances, Lucent's share price rebounded to $62 99/256 on July 17, 2000.

37.   On July 20, 2000, Lucent announced results for the third fiscal quarter of 2000 ended June 30, 2000, which were below expectations. In the Company's press release announcing those results, McGinn sought to assure investors that Lucent's business remained strong, and stated that Lucent's pro forma revenues from continuing operations would grow about 15% for the fourth fiscal quarter of 2000, and that pro forma earnings per share would be roughly in line with revenue growth. As was ultimately revealed, however, McGinn's July 20 guidance was knowingly false. According to a complaint filed against Lucent in December 2000 by Nina M. Aversano, Lucent's former President, North America - Service Provider Networks, in July 2000, shortly before McGinn provided his guidance, Aversano and Patricia Russo, the Chief Executive Officer of the SPN segment (which accounted for approximately 80% of Lucent's annual revenues), specifically told McGinn that the revenue and earnings projections for the fourth quarter that he intended to include in Lucent's press release were unattainable and needed to be reduced. Despite this information, McGinn issued the press release with the materially inflated fourth quarter expectations. Shortly thereafter, McGinn terminated Ms. Russo's employment.

38.   On October 10, 2000, Lucent disclosed information enabling analysts to determine that its optical networking business had actually declined 15% for the quarter, and that it was increasing its reserve for uncollectible accounts receivable by a material

12

amount. The market reaction to these disclosures was severe: On October 11, 2000, Lucent's share price fell more than $10 per share to close at $21 3/16 -- less than a third of the average price of Lucent shares during the period of October 26, 1999 to December 21, 2000.

39.    In an effort to stem the dramatic decline in Lucent's share price, Defendant falsely reassured the market about the strength of Lucent's business by announcing, on October 23, 2000, fourth quarter revenues of $9.4 billion, and pro forma earnings of $0.18 per share, which were in line with analysts' revenue expectations. The October 23, 2000 announcement had the desired effect. Lucent's share price rebounded to trade at approximately $24 per share by November 11, 2000 and analysts concluded that Lucent had begun to take a "step in the right direction."

40.    However, on November 21, 2000, Defendant revealed that the fiscal year 2000 fourth quarter results reported on October 23, 2000 materially overstated the Company's results and, accordingly, the Company in fact had not met analysts' expectations for the quarter. Specifically, the Company stated that an unspecified "revenue recognition problem" had impacted approximately $125 million of reported quarterly revenue. As a result, the Company announced that it would restate its fiscal fourth quarter revenues, and that earnings per share for the quarter and the year would be reduced by approximately two cents per share. The market reaction to the November 21, 2000 disclosure was severe: Lucent shares fell $3.31 to $17.63.

41.     Finally, on December 21, 2000, Lucent disclosed that its November 21, 2000
        announcement of a $125 million revenue recognition problem itself materially
        understated the depth of the problems at the Company. In a December 21, 2000
        announcement and conference call with analysts, the Company revealed that it was
        again restating its fiscal fourth quarter revenues, this time reducing revenue for the
        quarter by $679 million to $8.7 billion -- a figure $700 million less than the quarterly
        revenues initially reported, and more than $400 million greater than the restatement
        amount announced on November 21. The Company also revised its earnings per
        share for the quarter from $0.18 per share to $0.10 per share. In addition, the
        Company revealed that it would take a $1 billion restructuring charge in late
        January 2001.

42.     The December 21, 2000 announcement revealed that sales practices at the
        company were responsible for, among other things, the inappropriate recognition
        of hundreds of millions of dollars in revenue for sales of products which were later
        returned pursuant to prior agreement, and for sales of products which had been
        incompletely shipped.

43.     Lucent's December 21, 2000 announcement had a devastating effect on the
        Company's share price. Following this announcement, Moody's Investor Services
        downgraded Lucent's credit rating and Lucent shares plummeted to trade as low as
        $12.19 per share - $72 or 86% less than the October 26, 1999 to December 21,
        2000, high of $84.19.

14

44.   The plaintiffs made the following purchases and sales of Lucent common stock on the dates indicated in the Table of Lucent Share Purchases and Losses (see Exhibit 1).

45.   During the relevant time, Lucent's optical business was a material portion of Lucent's overall business, accounting for approximately 25% of Lucent's reported sales, according to research reports issued by SG Cowen on October 8, 1999 and JP Morgan, dated July 21, 2000.

46.   Analysts covering the Company viewed Lucent's optical networking business as a very important part of Lucent's future. For example, in an analyst report issued in November 1999, Credit Suisse First Boston described the Optical Networking Division as one of Lucent's "key top-line catalysts" for fiscal year 2000.

47.   Lucent was considerably behind its competitors in development of its optical products, in particular in attaining OC-192, the fastest class of fiberoptic networking technology on the market.

48.   To conceal the waning demand for the Company's products, Defendant engaged in a variety of practices during the period October 26, 1999 to December 21, 2000, designed to misrepresent the true state of Lucent's business. The facts which demonstrate these improper practices are set forth below.

49. By no later than the first quarter of fiscal 2000, Lucent's senior executives were directing that the Company recognize hundreds of millions of dollars of revenue from transactions where customers had not agreed to purchase the product.

50. During the first fiscal quarter of 2000 ended December 31, 1999, Lucent had improperly accounted for 37 deals and had fraudulently booked nearly $300 million in revenue.

51. Lucent also booked hundreds of millions of dollars of revenue on sales to customers who Lucent knew could not pay for the products. In many instances, Lucent agreed to provide financing to these customers to enable them to purchase Lucent products even though, without Lucent's financing, these customers would have gone bankrupt.

52. On December 21, 2000, Lucent announced it had reversed $452 million in revenue that it had recorded in 2000 from supposed sales to distributors, including Graybar, Anixter, Westcon, and CTDI, because they had the unconditional right to return the product and were only obligated to pay Lucent if they eventually sold the product to an end-user. Shortly after the fourth quarter ended, these distributors returned $452 million worth of products that the Company had previously recognized as sales. These sales actually were consignment sales and Lucent should not have recognized revenue until the distributors sold the product to an end-user and the distributors became obligated to pay Lucent for the product. These improper revenue recognition practices accounted for approximately two-thirds of the $679 million in fourth quarter revenue that Lucent reversed.

16

53.   Throughout the period October 26, 1999 to December 21, 2000, Lucent regularly
      disseminated material information about its businesses through the conduit of
      securities analysts employed by Wall Street investment banks. Specifically, Lucent
      managed investors' expectations for earnings by providing "guidance" to analysts.
      Defendant McGinn participated in regular conference calls with analysts on the
      Bloomberg Forum, during which he issued guidance on Lucent's business, results
      and future earnings. These analysts communicated that guidance to the
      marketplace, which in turn then influenced investors buying decisions and the
      Company's share price. As a result, Lucent was under pressure to meet analysts'
      earnings projections in order to continue to grow market capitalization and increase
      the value of the company's stock.

### False and Misleading Statements

54.   On October 26, 1999, Lucent issued a press release to announce the Company's
      fourth quarter operating results. In describing those results, Lucent made the
      following statements, which included statements from defendant McGinn:

> "Our ability to provide customers with the systems, software,
> silicon and services they need to build end-to-end next-
> generation networks continues to win Lucent new business
> and strengthen our relationships with existing customers," said
> McGinn. In fiscal 1999, Lucent announced more than $11
> billion in contract wins, including more than $2 billion in
> September alone. McGinn noted that Lucent's growth in the

17

fourth quarter was again driven by the company's focus on hot growth areas like optical networking, wireless networking and professional services. McGinn's and Lucent's statements that the Company's products and services were "continu[ing] to win Lucent new business and strengthen our relationships with existing customers," and that Lucent's growth was "driven by the Company's focus on hot growth areas like optical networking, wireless networking and professional services," were materially false and misleading as set forth in paragraphs 24-26 above.

55. During a Bloomberg Forum conference call with analysts on October 26, 1999 to discuss Lucent's results, McGinn stated to analysts: "We are experiencing exceptionally strong growth in data networking for service providers, in wireless networks, [and] in optical networking ..." McGinn was asked "whether optical networking was growing - you know people are saying the market is growing at 40 to 50% a year, are you in that range?" In response, McGinn stated: "I can tell you that you're right, that Optical is growing 40 to 50% and we're exactly the same range even though we are the leader." McGinn's statements were materially false and misleading based on, but not limited to, the following:

    (a)    At this time, Lucent was not "the leader" in optical networking, but was a quickly eroding second to Nortel, which had developed the OC-192 product in 1997; and

18

(b)     Lucent's optical networking business was not growing 40 to 50%, but was in decline, as customers rejected Lucent's older generation 2.5 gigabit products and Lucent was unable to market and successfully deploy its newer optical networking products, including an OC-192 product.

56.     In response to these materially false and misleading statements, shares of Lucent rose from a market price of $59.00 per share immediately prior to the Company's October 26, 1999 announcement to over $80.62 per share by November 18, 1999. Thereafter, based significantly on the guidance provided by the Company, the price of Lucent stock continued to rise, reaching a high of over $84.00 per share on December 9, 1999.

57.     On a January 7, 2000 conference call with analysts hosted by Bloomberg News reporter Eric Schatker, McGinn again sought to reassure the market about the underlying strength of demand for Lucent products by characterizing Lucent's Optical production problems as due to demand being "not fully anticipated by us." McGinn also stated that "it is an execution issue for us." Later in the call, he reiterated that the optical problems were due to Lucent not "hav[ing] the capacity to meet that need."

58.     On January 30, 2000, Lucent issued a press release announcing the Company's first quarter financial results, including revenue of $9.9 billion and net income per share of $0.38. These financial results were materially false and misleading for the reasons set forth above.

19

59.     On or about February 11, 2000, Lucent filed with the SEC the Company's quarterly
        report on Form 10-Q for the first quarter of 2000. In that 10-Q, Lucent reported,
        among other things, that its revenues were $9.9 billion and its net earnings per
        share were $0.38, as described above.  These results were materially false and
        intentionally misleading.

60.     On April 19, 2000, Lucent issued a press release, carried over PR Newswire,
        announcing financial results for its second fiscal quarter of 2000, including
        revenues of $10.3 billion and net income per share of $0.23. In addition, McGinn
        stated that "Lucent is regaining its momentum this quarter with strong growth in
        wireless, Internet infrastructure – including optical and data networking systems and
        optical fiber - professional services and optoelectronics." McGinn also noted that
        revenues for both wireless and service provider Internet infrastructure increased by
        more than 50 percent. These financial results and other statements were materially
        false when made due to the reasons set forth above.

61.     On May 15, 2000, an article carried on the Multichannel News Service of Cahners
        Publishing Company reported that Lucent announced it would sell $6 billion of
        optical networking gear in 2000, up from $4 billion in 1999. Further, the report
        stated that optical division head Kathy Szelag stated that the demand for Lucent's
        optical products was "unprecedented." She further stated that snags that hit the unit
        in its first fiscal quarter - component shortages and a lack of deployment personnel
        - had been ironed out. These statements were materially false and misleading at
        the time of their publication because, as Lucent recognized internally at this time,

the demand for its optical networking products was declining due to the systemic problems it was having in developing and deploying a working optical networking system capable of running at OC-192 speed.

62.     On July 20, 2000, Lucent issued a press release carried on the PR Newswire, announcing its third fiscal quarter results. The release's headline touted that "Revenues from Lucent's pro forma continuing operations [were] up 20% and pro forma earnings per share rose 30%." Lucent also stated that its OC-192 optical systems had seen "strong customer acceptance." However, the Company stated that its reported results for the quarter were a net loss of $301 million, or $.09 a share, but attributed the loss to charges as a result of recent acquisitions. These financial results and other statements were materially false when made for the reasons set forth above.

63.     The statements concerning Lucent's fourth quarter revenues and earnings contained in the Company's July 20, 2000 press release were made by and with the approval of McGinn, Lucent's Chief Executive Officer, with actual knowledge that they were false. McGinn knew that Lucent's business during the fourth quarter was continuing to deteriorate, and that the fourth quarter revenue guidance was unattainable based on the reasons set forth above.

64.     In addition, Lucent's statement in its July 20, 2000 Press Release that the Company's OC-192 optical systems had seen "strong customer acceptance" was false and misleading at the time it was made because customers were rejecting Lucent's OC-192 products in part because they had already given their orders to

21

Lucent's competitors that were far ahead of Lucent in ability to ship those systems, and in part because they failed to perform as promised.

65.   On November 21, 2000, Lucent conceded the October 23, forecast was inaccurate by filing with the SEC a Form 8-K that announced that the Company had identified a "revenue issue" involving approximately $125 million of revenue in its fourth fiscal quarter ended September 2000. At that time, Lucent also disclosed it could no longer confirm its guidance for the first quarter of fiscal 2001, ended December 31, 2000.

66.   The falseness of the results reported in the October 23, 2000 Form 8-K was further confirmed by Lucent's December 21, 2000 announcement that it was restating - for the second time - its results for the fourth quarter of 2000, reducing reported earnings for the quarter by $679 million. Further, on December 21, 2000, Lucent specifically acknowledged the fact that the Company's results had been inflated because Lucent had recognized revenue on sales that were not yet final.

67.   At all relevant times, the market for Lucent's stock was an efficient market for the following reasons, among others:

   (a)   Lucent's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

   (b)   As a regulated issuer, Lucent filed periodic public reports with the SEC and the NYSE;

(c)     Lucent regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Lucent was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

68.     As a result of the foregoing, the market for Lucent's stock promptly digested current information regarding Lucent from all publicly available sources and reflected such information in Lucent's stock price. Under these circumstances, purchasers of Lucent's common stock during the period, including Plaintiffs, suffered similar injury through their purchase of Lucent's common stock at artificially inflated prices and a presumption of reliance therefore applies.  This case arises from Defendant's efforts to conceal from the investing public the fact that Lucent was experiencing pervasive and material difficulties which were adversely impacting its revenues and profits, as well as its relationships with clients and customers.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

69.     Plaintiffs adopt and incorporate each of the allegations set forth above as if fully set forth herein. This Claim is asserted against Defendant for violations of Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

70.  During the period between October 26, 1999 to December 21, 2000, Lucent, by the use and means of instrumentalities of interstate commerce and the U.S. mails, engaged and participated in a scheme to defraud investors, including Plaintiffs, and the public markets. This scheme included conduct that inflated Lucent's financial results and concealed Lucent's true financial condition and operating results. As specified in the above paragraphs, the Company made false statements of material fact that caused the prices of Lucent common stock to be artificially inflated.

71.  Defendant is liable for the false and misleading statements as set forth in the paragraphs above.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands judgment against Defendant for compensatory damages, attorney fees, interest and costs.

**COUNT II**

**Violations of §8-6-17 and §8-6-19 of the Alabama Securities Act**

72.  Plaintiffs adopt and incorporate by reference each fact contained in paragraphs 1 through 71 as if fully set forth herein.

73.  This Count is asserted by Plaintiffs against Defendants and is based upon §8-6-17; §8-6-19(a)(1); and §8-6-19(a)(2) of the Alabama Securities Act.

74.  In violation of §8-6-17 of the Alabama Securities Act and §8-6-19, Defendants (a) include devices, schemes and artifices to defraud; (b) made untrue statements of

24

material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and the course of business which operated as a fraud and deceit upon the Plaintiffs.

75.    The Defendants offered and sold and/or participated in the offer and sale of and/or participated in the artifices to defraud described herein above in the offer and sale of stock by the means of misrepresenting and/or omitting the truthfulness of said statements. Defendant omitted the material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and the Plaintiffs did not know of such untruths and omissions, including those listed in the prior paragraph of this Complaint, all in violation of the Alabama Securities Act.    Defendant    directly and indirectly engaged and participated in a continuous course of conduct to conceal material information.

76.    The Defendant had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and disclose such facts, even though such facts were available to them. Defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true nature of the value of the security and to support the artificially inflated value. But for the activities of Defendant, the losses of the Plaintiffs would not have occurred.

77.    As the result of a dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, Plaintiffs has incurred substantial losses.

25

78.   At the time of said misrepresentations and omissions, Plaintiffs was unaware of the falsities. Had Plaintiffs known the truth regarding the actual financial health of the Defendant, Plaintiffs would not have purchased stock or otherwise invested his retirement money with Defendant.

79.   Defendants  offered the securities to the Plaintiffs by means of oral and written communications, which included one or more misrepresentations of material fact and/or omissions to state a material fact necessary in order to make the statements, in light of the circumstances in which they were made, not misleading, in violation of §8-6-19(a)(1) and (2) of the Alabama Securities Act, and the Plaintiffs did not know of such untruths or such omissions.  The foregoing acts and omissions also constitute, in connection with the sale of securities to Plaintiffs, a "device, scheme, or artifice to defraud" as well as omissions to state material facts necessary to make the statements made not misleading.

80.   As a direct and proximate result of Defendants's wrongful conduct, Plaintiffs has suffered damages in connection with the purchase of securities from Defendant.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands judgment against Defendant  for compensatory and punitive damages in an amount to which a jury may determine the Plaintiffs are entitled plus attorney fees, interest and costs.

## COUNT III

### Common Law Fraud

81.   Plaintiffs adopt and incorporate by reference each fact contained in paragraphs 1 through 80 as if fully set forth herein.

26

82.     Defendant, by and through its agents and/or employees, suppressed material facts previously referenced herein, from Plaintiffs and other shareholders, regarding the severe financial problems that would have crippled the Defendant's stock price.

83.     Further, at various times previously referenced in this Complaint, Defendants' employees made representations regarding the financial condition of the Defendant which were false, and made with the intent that Plaintiffs, and other shareholders, would rely on them.

84.     As a consequence of the repeated acts of fraudulent suppression and misrepresentation perpetrated by Defendant, through its agents and/or employees, Plaintiffs suffered damages in connection with the purchase of Defendant's securities.

85.     All Plaintiffs herein did not discover the fraud perpetrated on them until, at the earliest, sometime in 2001, and the statutes of limitations for these Plaintiffs were tolled by the filing of various class action lawsuits beginning on January 7, 2000, which ultimately resulted in the massive class action settlement In Re: *Lucent Technologies, Inc. Securities Litigation,* Case No. 00-CV-621 (JAP) United States District Court for the District of New Jersey. Hence, under the *American Pipe* doctrine and its progeny, the statutes of limitations for the Plaintiffs herein for common law fraud have not expired.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands judgment against Defendant in an amount of compensatory and punitive damages justified according to proof, plus interest, costs and attorney fees.

27

**PLAINTIFFS DEMAND TRIAL BY STRUCK JURY ON ALL ISSUES**

W. Lewis Garrison, Jr. ASB-3591-N74W
Richard A. Cusick ASB-6533-S50R

OF COUNSEL:

GARRISON SCOTT, P.C.
2224 First Avenue North
Birmingham, AL 35203
205- 326-3336
205-326-3332 - facsimile

**SERVE DEFENDANT BY CERTIFIED MAIL AT:**

Lucent Technologies, Inc.
c/o Prentice Hall Corporation Systems, Inc.
150 South Perry Street
Montgomery, AL 36104

28

EXHIBIT A: Table of Lucent Share Purchases and Losses

| PLAINTIFF | Shares Purchased | Single Share Purchase Price | Date Shares Purchased | Final Single Share Valuation* | Loss |
|---|---|---|---|---|---|
| Artmann, William | 1100 | $75.88 | 3-Jan-2000 | $68.50 | ($8,112.50) |
| Artmann, William | 1600 | $75.88 | 3-Jan-2000 | $21.00 | ($87,800.00) |
| Baroody, Alan | 100 | $52.50 | 24-Feb-2000 | $14.19 | ($3,831.00) |
| Baroody, Alan | 100 | $23.00 | 20-Nov-2000 | $14.19 | ($881.00) |
| Baroody, Alan | 100 | $17.00 | 30-Nov-2000 | $14.19 | ($281.00) |
| Barrow, Eugenie | 10 | $30.50 | September-00 | $14.19 | ($163.10) |
| Beckerle, Robert | 100 | $52.63 | 25-Feb-2000 | $14.19 | ($3,843.50) |
| Bozeman, Harold | 500 | $17.50 | 18-Dec-2000 | $14.19 | ($1,655.00) |
| Brannon, Clarence | 100 | $67.50 | 16-Mar-2000 | $14.19 | ($5,331.00) |
| Brown, Richard | 270 | $19.94 | 21-Nov-2000 | $14.19 | ($1,551.83) |
| Bunch, John | 100 | $56.00 | 4-Apr-2000 | $14.19 | ($4,181.00) |
| Bunch, John | 100 | $20.50 | 17-Oct-2000 | $14.19 | ($631.00) |
| Callaway, Nancy | 312 | $59.25 | May-00 | $47.81 | ($3,568.66) |
| Dismukes, Susan | 525 | $74.78 | 18-Nov-1999 | $14.19 | ($31,809.91) |
| Edmundson, Grady | 50 | $54.38 | 8-Feb-2000 | $14.19 | ($2,009.25) |
| Goodson, Michael | 300 | $74.63 | 15-Nov-1999 | $56.06 | ($5,568.75) |
| Hamilton, Charles | 250 | $48.38 | 26-Jul-2000 | $14.19 | ($8,546.25) |
| Hebling, George | 20 | $52.88 | 7-Jan-2000 | $14.19 | ($773.70) |
| Hicks, O.I. | 100 | $53.57 | 20-Jan-2000 | $14.19 | ($3,938.00) |
| Hodnett, James | 400 | $52.88 | 17-Feb-2000 | $14.19 | ($15,474.00) |
| Hodnett, James | 42 | $53.13 | 11-Feb-2000 | $14.19 | ($1,635.27) |
| Inge, Herndon | 100 | $54.31 | 26-May-2000 | $14.19 | ($4,012.25) |
| Inge, Herndon | 100 | $41.31 | 23-Aug-2000 | $14.19 | ($2,712.25) |
| Johnson, Clifford | 200 | $68.56 | 3-2-200 | $14.19 | ($10,874.00) |
| Johnson, Clifford | 100 | $68.00 | 10-Mar-2000 | $14.19 | ($5,381.00) |
| Johnson, Clifford | 100 | $68.00 | 15-Mar-2000 | $14.19 | ($5,381.00) |
| Johnson, Clifford | 100 | $53.37 | 21-Jul-2000 | $14.19 | ($3,918.00) |
| Jordan, Scott | 200 | $53.71 | 7-Jan-2000 | $14.19 | ($7,904.00) |

* Reflects Lucent share price at close
of Class Period ($14.19) or sale price
for shares sold before end of period

| PLAINTIFF | Shares Purchased | Single Share Purchase Price | Date Shares Purchased | Final Single Share Valuation* | Loss |
|---|---|---|---|---|---|
| Jordan, Tommy | 50 | $48.56 | 26-Jul-2000 | $14.19 | ($1,718.63) |
| Kelly, Robert | 100 | $52.81 | 7-Jan-2000 | $14.19 | ($3,862.25) |
| Kirkwood, Douglas | 100 | $74.81 | 31-Dec-1999 | $14.19 | ($6,062.25) |
| Martin, Dale | 200 | $75.00 | 30-Dec-1999 | $14.19 | ($12,162.00) |
| Martin, Dale | 200 | $70.81 | 6-Jan-2000 | $14.19 | ($11,324.50) |
| Martin, Dale | 200 | $22.06 | 11-Oct-2000 | $14.19 | ($1,574.50) |
| Martin, Dale | 200 | $17.81 | 21-Nov-2000 | $14.19 | ($724.50) |
| McDaniel, Brian | 500 | $56.63 | 26-Jan-2000 | $14.19 | ($21,217.50) |
| Methvin, Amy | 1000 | $42.91 | 12-Jan-2000 | $14.19 | ($28,723.00) |
| Misiak, frank | 100 | $60.00 | 7-Apr-2000 | $14.19 | ($4,581.00) |
| Misiak, frank | 100 | $43.00 | 3-Aug-2000 | $14.19 | ($2,881.00) |
| Mitchell, Earl | 300 | $65.00 | 23-Mar-2000 | $54.25 | ($3,225.00) |
| Modi, Girish | 50 | $61.25 | 18-Mar-2000 | $14.19 | ($2,353.00) |
| Modi, Girish | 25 | $21.25 | 16-Oct-2000 | $14.19 | ($176.50) |
| Modi, Girish | 100 | $18.25 | 12-Nov-2000 | $14.19 | ($406.00) |
| Owens, Jene | 372 | $15.75 | 4-Dec-2000 | $14.19 | ($580.32) |
| Parrish, Cecil | 200 | $53.88 | 7-Jan-2000 | $15.50 | ($7,675.00) |
| Pepper/Skipwith | 300 | $21.25 | 11-Oct-2000 | $14.19 | ($2,118.00) |
| Peters, Charles | 100 | $58.44 | 14-Jun-2000 | $14.19 | ($4,424.75) |
| Peters, Charles | 200 | $40.94 | 28-Aug-2000 | $14.19 | ($5,349.50) |
| Pilcher, Sammy | 500 | $53.50 | 12-Jan-2000 | $14.19 | ($19,655.00) |
| Pilcher, Sammy | 1000 | $52.44 | 25-Jul-2000 | $14.19 | ($38,247.00) |
| Pilcher, Sammy | 500 | $51.00 | 26-Jul-2000 | $14.19 | ($18,405.00) |
| Pound, Jere | 1600 | $53.56 | 24-Feb-2000 | $14.19 | ($62,996.00) |
| Povall, A.S. | 8000 | $63.26 | 12-Jan-2000 | $52.66 | ($84,800.00) |
| Randman, Michael | 100 | $53.75 | 7-Jan-2000 | $14.19 | ($3,956.00) |
| Ratliff, Hubert | 100 | $64.94 | 24-Mar-2000 | $14.19 | ($5,074.75) |

* Reflects Lucent share price at close of Class Period ($14.19) or sale price for shares sold before end of period

Page 2 of 3

# EXHIBIT 1. Table of Lucent Share Purchases and Losses

| PLAINTIFF | Shares Purchased | Single Share Purchase Price | Date Shares Purchased | Final Single Share Valuation* | Loss |
|---|---|---|---|---|---|
| Skelton, Mary | 1900 | $18.38 | 19-Dec-2000 | $14.19 | ($7,951 50) |
| Smith, Harold | 32 | $63.19 | 28-Oct-1999 | $14.19 | ($1,567.86) |
| Smith, Harold | 135 | $22.18 | 13-Oct-2000 | $14.19 | ($1,078.83) |
| Swanson, Wallace | 500 | $53.00 | 7-Jan-2000 | $14.19 | ($19,405.00) |
| Thompson, Richard | 800 | $32.33 | 27-Nov-2000 | $14.19 | ($14,512.00) |
| Uritsky, Gerald | 100 | $73.50 | 10-Jan-2000 | $14.19 | ($5,931 00) |
| Willis, Frank | 8 | $67 25 | 10-Nov-1999 | $14.19 | ($424.48) |
| Willis, Frank | 10 | $73.25 | 17-Nov-1999 | $14.19 | ($590.60) |
| Willis, Frank | 2 | $75.38 | 6-Jan-2000 | $14.19 | ($122.37) |
| Willis, Frank | 8 | $20.13 | 18-Dec-2001 | $14.19 | ($47.48) |
| Wood, Henry | 100 | $21.44 | 11-Oct-2000 | $14.19 | ($724.75) |

\* Reflects Lucent share price at close of Class Period ($14.19) or sale price for shares sold before end of period

| TOTAL | ($638,397.02) |
|---|---|